**CKR|law**

1330 Avenue of the Americas, 14th Floor | New York, NY 10019
T +1.212.259.7300 | F +1.212.259.8200
www.ckrlaw.com

January 10, 2019

**VIA ECF**
Honorable William H. Pauley, III
United States District Court, Southern District of New York
500 Pearl Street, Room 1920
New York, New York  10007

        Re:    <u>Theresa Harrison v. Port Authority of New York and New Jersey</u>
                  United States District Court Case No. 17-cv-06281(WHP)

Dear Judge Pauley:

      I write on behalf of Theresa Harrison ("Ms. Harrison" or "Plaintiff") pursuant to the Court's motion practice rules in opposition to defendant's pre-motion conference request to file a FRCP 56(b) summary judgment motion to dismiss plaintiff's complaint in its entirety.

      As an initial matter, Ms. Harrison takes this opportunity to present facts that defendant *omitted* in its recitation. First, although probationary employees are provided with one year of training prior to becoming a permanent employee, according to defendant's witnesses *no* probationary employee in recent memory had been terminated before the end of the full training period, except Theresa Harrison. Nor had any employee, probationary or permanent, been terminated for a runway incursion, except Theresa Harrison.

      It is in this light that the four to five months of Ms. Harrison's tenure must be measured. Following the usual on-boarding and orientation period, Ms. Harrison was assigned to be "trained" by three employees with little more experience than she, rather than her immediate supervisors as was common practice. One of Ms. Harrison's co-workers, though, warned her that defendant was "building a file" on her [*See Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 93 (2d Cir. 1996) (reversing summary judgment where factfinder could determine that employer "was creating a record aimed at rationalizing plaintiff's termination")], and indeed within a few weeks of Ms. Harrison's official training period, the three trainers submitted reports citing certain purported deficiencies and advised that she needed "more training." Unsurprisingly, each of the reports from the respective trainers contained language that was virtually identical in tone and substance.

      In addition, Ms. Harrison became concerned that the full complement of training was being slow-walked and raised questions about it to her supervisors in writing. The next day, one of her supervisors approached Ms. Harrison, and, addressing her as "you," demanded that she undergo a "progress check ride" without any advance notice or preparation. There is no record

evidence that any other employee has ever been required to submit to a "spot" progress check ride, except Theresa Harrison.

Unbeknownst to Ms. Harrison at the time, as well, (and even at the time of the filing of her complaint), by mid-October 2016, her supervisors *were* devising a plan to not only limit her training, but to terminate her as well. The supervisors, spearheaded by the unit chief, James Munday, removed Ms. Harrison from the list of probationary employees previously scheduled to attend a critical advance training session known as Part 139 training. Ms. Harrison was replaced on the training schedule by a male employee, Andrew Sewell, who had begun his employment with defendant after her. Finally, the supervisors began to set in motion her termination.

One management official outside of Ms. Harrison's supervisory chain, and the then union Vice-President, objected on the basis that she had not been given an opportunity for training on an equal basis as other trainees and was concerned that the termination could become a "legal" matter. Human Resources also objected on the same basis. No HR or management employment could "recall" at depositions (and no specific documents on this issue was produced by defendant in discovery) the precise circumstances or decision-makers that led to Ms. Harrison not being terminated in October, but the effort did not die. Rather, it merely went dormant.

From October until the date of her termination on December 23, 2016, Ms. Harrison was never afforded an opportunity to attend the advance Part 139 training. Nevertheless, when she took the critical written and driving tests that would grant her certification to operate a vehicle on the airfield without supervision in early November 2016, Ms. Harrison received a passing grade of 100% on the written portion and passed the driving portion without incident. And, from November until her termination, there is *no* record evidence of any performance deficits by Ms. Harrison.

Ms. Harrison disputes that she was involved in a "runway incursion" that resulted in an airline deviation that led to her termination, and defendant will be utterly unable to proffer credible evidence that it was Ms. Harrison's vehicle on the runway, as opposed to another vehicle. Indeed, there is no evidence that it was actually Ms. Harrison's vehicle. The video and radar recordings produced by defendant and supposedly used to justify her termination do not support this contention. Moreover, Ms. Harrison will lodge challenges to the authenticity and reliability of each the recordings. More to the point, the FAA control tower supervisor who had a clear view of the field at the time of the go-around, related a wholly different version of the incident than the one now proffered by defendant, including whether the vehicle involved belonged to the electricians working on the field that morning. Significantly, in a recording produced by defendant, the FAA employee agreed to change her written report after speaking with one of the responsible managing officials.

Most important, James Munday knew that the senior managers and HR personnel that he would ordinarily need approval from for a termination were on Christmas vacation that week and that he had been "delegated" that authority. Munday wasted absolutely no time, and Ms. Harrison was unceremoniously fired the next day. The investigation, such as it was, consisted

CKR | law

solely of reviewing video tapes of no probative value and contradicted the report of the eyewitness. Moreover, the FAA had not made any official assessment of the seriousness of the event at the time of the termination. When the FAA did make an assessment, it found that out of the four designated categories of seriousness ["A" being the most serious and "D," the least], the event was assigned a "C" as the second to least serious category]. *See Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 562 (S.D.N.Y. 2010)(pretext may be inferred where employer "exaggerated the seriousness of the conduct that allegedly justified the adverse action").

In practice, moreover, employees who have incurred an initial vehicle deviation are required to re-do training. They are not fired. Which is what happened to Andrew Sewell, the probationary employee who had started his tenure after Ms. Harrison and received the critical Part 139 training in her stead. About a month and a half after her termination, Sewell was involved in an incursion that was more serious than the event that led to Ms. Harrison's termination. Yet, Mr. Sewell was not terminated *despite* his probationary status.

Viewing the facts in the light most favorable to Ms. Harrison, defendant's argument by its pre-motion letter that it had legitimate non-discriminatory reasons for its disparate treatment of her in training opportunities and her subsequent termination and/or that those reasons were not pretext for gender and race discrimination is just simply devoid of any merit. In addition to the harassing treatment of Ms. Harrison from the very beginning of her tenure that made it clear to her that she was unwanted because she was a woman and more particularly a black woman, the rank discriminatory and eventually unsuccessful efforts by James Munday to terminate her in October 2016, the lack of credible evidence supporting defendant's claim that Ms. Harrison's vehicle was responsible for the incursion, the slipshod investigation of those events, coupled with Munday's patently opportunist exploitation of his superiors' vacation schedules, that Ms. Harrison can point to a similarly situated *probationary* male employee who was treated differently than her utterly undermines defendant's claim that a reasonable jury could not find that discrimination was "afoot."

Courts must, of course, "resolve all ambiguities and draw all reasonable inferences" against the moving party [*Walsh v. NYC Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016)], and defendant is not entitled to summary judgment where plaintiff has produced evidence "sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." *Id.*, at 75; *Chambers v. TRM Copy Ctrs. Com.*, 43 F.3d 29, 37-38 (2d Cir. 1994). Put simply, Ms. Harrison can produce evidence that would permit a trier of fact to find that defendant's employment decisions were motivated by discriminatory animus, and its request that a summary judgment motion be "fully briefed" must be rejected as an utterly futile exercise.

Very truly yours,

Lisa Alexis Jones

cc: Cheryl Alterman, Esq. (via ECF)

CKR | law