UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
THERESA HARRISON,

                Plaintiff,

     -against-

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY,

                Defendant.
-----------------------------------------------------------

17cv6281

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, Senior United States District Judge:

        Plaintiff Theresa Harrison brings this employment discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII") against Defendant the Port Authority of New York and New Jersey (the "Port Authority"). Harrison contends the Port Authority subjected her to a hostile work environment, denied her training opportunities, and wrongfully terminated her employment on account of her race, gender, and national origin. The Port Authority moves for summary judgment dismissing all claims. For the following reasons, the Port Authority's motion is granted in part and denied in part.

## BACKGROUND

I.     The Hiring Process

        Harrison is a black woman of Jamaican descent. (Def.'s Reply Statement to Pl.'s Counter-Statement of Facts Pursuant to Rule 56.1, ECF No. 61 ("Def.'s Reply 56.1"), ¶ 141.) In August 2016, Harrison started working as a temporary operations services supervisor ("FS-3") in the Aeronautical Operations Unit of Newark Liberty International Airport ("EWR"). (Pl.'s Statement of Material Facts, ECF No. 57 ("Pl.'s 56.1"), ¶ 5.)

At some point between August 19 and August 22, 2016, Harrison reported for work and met with EWR's Deputy Chief of Operations, Cameron Boyer, and its Chief of Operations, George Martinez. According to Harrison, Boyer and Martinez asked for her resume because they believed a male candidate had been selected to fill the FS-3 vacancy. (Pl.'s 56.1 ¶ 159.) The Port Authority denies that either Boyer or Martinez stated they were expecting a male candidate. (Def.'s Reply 56.1 ¶¶ 159, 164.)

II.     Harrison's FS-3 Training

FS-3s are responsible for maintaining airport safety by operating motor vehicles on or near active runways. (Pl.'s 56.1 ¶ 12.) The Port Authority mandates that all FS-3s undergo training to ensure compliance with Part 139 of the Code of Federal Regulations ("C.F.R."), which sets operational and safety standards for airports. (Pl.'s 56.1 ¶¶ 24–27.) The Port Authority's C.F.R. Part 139 training begins with "kiosk training" and "DR1 training." (Pl.'s 56.1 ¶¶ 29–30.) Once completed, FS-3 trainees enter "DR2 training," where they learn to safely operate a motor vehicle around the airport over a four-to-six-week period. (Pl.'s 56.1 ¶¶ 31–33.) DR2 training is comprised of: classroom training; an airfield tour; on-the-job training for a minimum of four weeks, during which the trainee is accompanied by a DR2-certified employee when driving on the airfield; a written test; an airfield map evaluation; and two "check rides" (one during the day and another at night). (Pl.'s 56.1 ¶ 33.) FS-3 trainees must also complete wildlife hazard management training, which includes firearms and pyrotechnics training. (Pl.'s 56.1 ¶ 40.) On completion of the required training, an FS-3 is qualified to operate a vehicle on the airfield. (Pl.'s 56.1 ¶ 41.) The Port Authority offers qualified FS-3s additional education opportunities based on seniority, including an "AAAE class" that provides case studies on

managing airfields in accord with Federal Aviation Administration regulations. (Pl.'s 56.1 ¶ 42.) FS-3s are not required to take the AAAE class. (Pl.'s 56.1 ¶ 42.)

By August 29, 2016, Harrison completed kiosk training, DR1 training, and the DR2 classroom training and airfield tour. She then commenced her on-the-job DR2 training. (Pl.'s 56.1 ¶¶ 72–74.) Over the next several weeks, however, the certified employees who conducted Harrison's on-the-job training observed and reported deficiencies in her progress. On September 9, 2016, one of Harrison's trainers informed Boyer and Martinez that Harrison was "unaware of surrounding aircraft[]," "unable to identify various taxiways," and "often fail[ed] to . . . recognize the location of aircraft[]." (Pl.'s 56.1 ¶ 76.) One week later, that same trainer observed that Harrison's "radio transmissions ha[d] improved but [she] still show[ed] some nervousness" and "ha[d] some difficulty traveling in the taxiway system and paying attention to the radio and recognizing location of aircraft[]." (Pl.'s 56.1 ¶ 77.) On September 22, 2016, a different trainer emailed Boyer and Martinez stating, in part, that Harrison struggled with her situational awareness. (Pl.'s 56.1 ¶ 78.) And two days later, a third trainer informed Martinez that Harrison needed to improve her situational awareness, especially at night. (Pl.'s 56.1 ¶ 79.)

Despite these difficulties, on September 27, 2016, Martinez added Harrison's name to a list of employees eligible for the AAAE class being offered in mid-October. (Pl.'s 56.1 ¶ 80.) But Harrison's training woes continued. On October 3, 2016, one of Harrison's trainers informed Boyer and Martinez that she "still ha[d] some difficulty traveling in the taxiway system and paying attention to the radio, and recognizing the location of aircraft[]." (Pl.'s 56.1 ¶ 81.) Two days later, Boyer administered a "pre-check" ride to Harrison, during which she allegedly struggled to identify taxiways and types of aircraft. (Pl.'s 56.1 ¶ 84; Decl. of Cheryl Alterman in Supp. of Mot. for Summ. J., ECF No. 49 ("Alterman Decl."), Exs. WW,

XX.) That same day, Boyer also administered a practice map test on which Harrison allegedly failed to identify at least three taxiways. (Alterman Decl., Ex. NN ¶ 36.) Boyer graded the map test using a game of "hangman." That is, he drew different pieces of the hangman to denote incorrect answers on the map. (Pl.'s 56.1 ¶ 101; Alterman Decl., Ex. III.) The Port Authority used the game to grade its employees' map tests at EWR both before and during Harrison's employment. (Pl.'s 56.1 ¶ 101.)

On October 14, 2016, the Port Authority initiated internal discussions about terminating Harrison's employment. (Pl.'s 56.1 ¶ 88.) And on October 17, 2016, EWR's Operations Manager, James Munday, directed EWR's Senior Business Manager, Lorraine Monetti, to remove Harrison's name from the list of AAAE class attendees. (Pl.'s 56.1 ¶ 90; Alterman Decl., Ex. AAA.) Munday also directed Monetti to add Andrew Sewell—a black male FS-3 hired only three days earlier—to the AAAE list. (Pl.'s 56.1 ¶ 90; Alterman Decl., Ex. AAA.; Def.'s Reply 56.1 ¶ 256.) According to the Port Authority, these decisions flowed from Harrison's insufficient progress after nearly seven weeks of on-the-job DR2 training. (See Def.'s Statement of Undisputed Facts Pursuant to Rule 56.1, ECF No. 48 ("Def.'s 56.1"), ¶ 89.) Harrison, however, claims that emails exchanged between Munday and other Port Authority employees in mid-October 2016 evince discriminatory animus. (See Pl.'s 56.1 ¶¶ 258–64.) These emails indicate that some Port Authority employees felt uncomfortable removing Harrison from the AAAE class and terminating her employment. One employee suggested that the Port Authority "should be showing that [it] did EVERYTHING to help [its] employees['] success" and that "[w]ashing some one [sic] out this early without providing 139 training as we are to others with less time is problematic." (Decl. of Lisa Alexis Jones, ECF No. 58 ("Jones Decl."), Ex. 13). Another employee wondered whether "it ever occurred where [the Port Authority]

4

extended the training period for a new hire beyond the typical[] 4 to 6 weeks." (Jones Decl., Ex. 14). In light of these concerns, the Port Authority did not terminate Harrison in October 2016. But the Port Authority adhered to its decision to not allow Harrison to attend the AAAE class. (Pl.'s 56.1 ¶¶ 90–91.)

Harrison continued her training, and on November 2 and 3, 2016, she passed her DR2 check rides. (Pl.'s 56.1 ¶¶ 93, 95.) Thus, as of November 3, 2016, Harrison was a DR2-certified driver and qualified to complete all of her responsibilities as an FS-3 at EWR.[1] (Pl.'s 56.1 ¶ 96.)

III.     The Camera Incident

After receiving her DR2 certification, Harrison brought her camera to work to assist in preparing required reports. (Def.'s Reply 56.1 ¶ 288.) Harrison's supervisor, Marcus Stanford, reprimanded Harrison for using her camera instead of a Port Authority-issued camera. (Def.'s Reply 56.1 ¶ 289.) According to Harrison, Stanford asked Harrison whether she felt harassed by his rebuke and noted that women are "notorious" for complaining about harassment. (Pl.'s 56.1 ¶ 292.) The Port Authority admits that Stanford instructed Harrison to use a Port Authority-issued camera, but it denies that Stanford made any statements about harassment. (Def.'s Reply, ¶¶ 289, 292–94.)

IV.     The Runway Incursion, Harrison's Termination, and Sewell's Incursion

On the morning of December 22, 2016, Harrison drove EWR's wildlife patrol truck onto the airfield to conduct routine wildlife patrol. (Pl.'s 56.1 ¶ 114.) At roughly 7:07 a.m., an alarm sounded indicating an unauthorized incursion on an active runway. (Pl.'s 56.1 ¶ 120.) Because of the incursion, an aircraft aborted its landing to avoid a collision with the

---

[1] Harrison completed her firearms and pyrotechnical training on October 12, 2016. (Pl's 56.1 ¶ 86.)

5

incurring vehicle. (Pl.'s 56.1 ¶ 124.) The Port Authority investigated and—based on radar, video footage, and eyewitness accounts—concluded that Harrison committed the incursion while driving the wildlife patrol truck. (Pl.'s 56.1 ¶¶ 132, 138.) The Port Authority terminated Harrison's employment the following day. (Pl.'s 56.1 ¶ 138.) Although the Port Authority contends it terminated Harrison because of the incursion and her earlier training deficiencies, she maintains the Port Authority's investigation was rushed and that the true reason for her termination was unlawful discrimination. (Pl.'s 56.1 ¶¶ 138–39.) Indeed, Harrison claims it is unclear whether she committed the runway incursion given the presence of other vehicles on the airfield that morning. (Pl.'s 56.1 ¶ 132.)

Notably, in February 2017, Sewell committed a runway incursion when escorting a team of snow removal vehicles across the airfield during a snowstorm. (Pl.'s 56.1 ¶ 134.) The incursion caused one plane to abort its takeoff and another to abort its landing. (Jones Decl., Exs. 29, 30.) The Port Authority did not terminate Sewell following his incursion. (Def.'s Reply 56.1 ¶ 412.)

## DISCUSSION

I. Legal Standard

Summary judgment is proper only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Baez v. JetBlue Airways Corp., 793 F.3d 269, 274 (2d Cir. 2015) (quotation marks omitted). This Court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."

Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists . . . ." Rodriguez v. City of New York, 72 F.3d 1051, 1060–61 (2d Cir. 1995). If the moving party meets its burden, "the adverse party must set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250 (citation and quotation marks omitted); Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009). "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation and alterations omitted). "In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party." Flanigan v. Gen. Elec. Co., 242 F.3d 78, 83 (2d Cir. 2001).

II.   Race, Gender, and National Origin Discrimination, and Wrongful Termination

To begin, Harrison contends that the Port Authority discriminated against her on the basis of her race, gender, and national origin and wrongfully terminated her employment in violation of Title VII. Her claim is assessed under the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See also Walsh v. N.Y.C. Hous. Auth., 828 F.3d 70, 74–75 (2d Cir. 2016). Under that framework, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. Delaney v. Bank of Am. Corp, 766 F.3d 163, 168 (2d Cir. 2014) (per curiam). To meet her burden, the plaintiff must demonstrate that: (1) she is a member of a protected class; (2) she was qualified for the job for

7

which she applied; (3) she suffered an adverse employment action; and (4) the circumstances of the adverse action raise an inference of discrimination. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

If the plaintiff makes that initial showing, the burden of production shifts to the employer to demonstrate a legitimate, non-discriminatory reason for the adverse employment action. Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). And "[i]f the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for . . . discrimination." Kirkland v. Cablevision Sys., 760 F.3d 223, 225 (2d Cir. 2014) (per curiam). The plaintiff's "admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the [employer's] employment decision was more likely than not based in whole or in part on discrimination." Terry v. Ashcroft, 336 F.3d 128, 138 (2d Cir. 2003) (quotation marks omitted).

A. Harrison's Prima Facie Case

i. Protected Class

The Port Authority concedes that Harrison is a member of a protected class; she is a black woman of Jamaican descent. (Mem. of Law in Supp. of Def.'s Mot. for Summ. J., ECF No. 50 ("Def.'s SJ Mot."), at 3.)

ii. Qualifications

The Port Authority avers that Harrison was not qualified for the FS-3 position because she consistently failed to demonstrate the situational awareness needed to operate a vehicle on the airfield. To bolster its argument, the Port Authority points to Harrison's struggles during on-the-job DR2 training, including the accumulation of unsatisfactory progress reports received from Harrison's trainers.

An employee is "qualified" under the McDonnell Douglas framework if she makes the "minimal showing" that "she possesses the basic skills necessary for performance of [the] job." Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001) (alteration in original) (emphasis removed) (quotation marks omitted); see also Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91–92 (2d. Cir. 2001). The parties agree that Harrison's resume reflected prior supervisory experience at other airports and knowledge of C.F.R. Part 139. (Pl.'s 56.1 ¶ 69.) The Port Authority reviewed Harrison's credentials and ultimately hired her. And where "the employer has . . . hired the employee, the inference of minimal qualification is not difficult to draw." Slattery, 248 F.3d at 92. Notably, once hired, Harrison quickly completed her kiosk training, DR1 training, and DR2 classroom training and airfield tour. (Pl.'s 56.1 ¶¶ 72–74.) Although Harrison needed more than the four to six weeks that the Port Authority deems appropriate for FS-3s to complete DR2 training, she eventually completed her check rides. Therefore—as the Port Authority concedes—by "November 3, 2016, [Harrison] was a DR2-certified driver, and . . . qualified to complete all of the duties and responsibilities required of her as an FS-3 at EWR." (Def's 56.1 ¶ 96.) Harrison's ability to complete her required training is sufficient to demonstrate her qualifications at this stage. See Brown v. CSX Transp. Inc., 155 F. Supp. 3d 265, 270 (W.D.N.Y. 2016) (finding issues of material fact as to plaintiff's qualifications where plaintiff completed training).

      iii.   Adverse Employment Action

Turning to the third prong of her prima facie case, Harrison contends that the Port Authority subjected her to two adverse employment actions: (1) denial of training opportunities, as illustrated by her removal from the AAAE class in October 2016, and (2) her termination in December 2016.

"Denial of training can constitute an adverse employment action where it 'bear[s] on either plaintiff's opportunities for professional growth and career advancement or directly on plaintiff's compensation.'" Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 352 (S.D.N.Y. 2006) (alteration in original) (quoting Nakis v. Potter, 2004 WL 2903718, at *20 (S.D.N.Y. Dec. 15, 2004). However, "[w]hen an employee cannot show material harm from a denial of training, such as a failure to promote or a loss of career advancement opportunities, there is no adverse employment action." Hill, 467 F. Supp. 2d at 352; see, e.g., Moore v. Metro. Transp. Auth., 999 F. Supp. 2d 482, 499 (S.D.N.Y. 2013) ("The denial of professional training opportunities may constitute an adverse employment action, but only where an employee can show material harm from the denial . . . ." (quotation marks omitted)); Trachtenberg v. Dep't of Educ. of N.Y.C., 937 F. Supp. 2d 460, 468 (S.D.N.Y. 2013) (same); Novak v. Waterfront Comm'n of N.Y. Harbor, 928 F. Supp. 2d 723, 731 (S.D.N.Y. 2013) (same).

The Port Authority's removal of Harrison from the AAAE training class is not an adverse employment action. Although Harrison observes that the Port Authority replaced her with Sewell—an employee with less seniority—she fails to explain how that decision resulted in material harm. The record is clear that the AAAE training class is distinct from the Port Authority's mandatory FS-3 training curriculum. (Pl.'s 56.1 ¶ 42.) Moreover, Harrison does not dispute that even after her removal from the attendee list, she continued her on-the-job DR2 training. (Pl.'s 56.1 ¶ 93.) By the time Harrison obtained her certification, she had received over nine weeks of training—more than the four to six weeks typically needed by FS-3 trainees. (Def.'s Reply 56.1 ¶ 284.) Harrison's contention that the Port Authority refused to train her is therefore plainly belied by the record. Accordingly, the failure to train claim is dismissed.

However, the Port Authority concedes that Harrison's termination in December 2016 is an adverse employment action. (Def.'s SJ Mot., at 3.) Therefore, this Court examines whether the circumstances surrounding her termination raise an inference of discrimination.

### iv. Inference of Discrimination

Harrison proceeds under a "disparate treatment" theory in arguing that her termination occurred under circumstances raising a discriminatory inference. Indeed, "[a] plaintiff may raise such an inference by showing that the employer . . . treated [her] less favorably than a similarly situated employee outside [her] protected group." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). The plaintiff must "show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." Graham, 230 F.3d at 39 (quoting Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)). To satisfy the "'all material respects' standard for being similarly situated, a plaintiff must show that her co-employees were subject to the same performance evaluation and discipline standards." Graham, 230 F.3d at 40 (quoting Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 96 (2d Cir. 1999)). The comparator "who went undisciplined [must have also] engaged in comparable conduct." Graham, 230 F.3d at 40; see also Mazzella v. RCA Glob. Commc'ns, Inc., 642 F. Supp. 1531, 1547 (S.D.N.Y. 1986) ("Rather, in order to be similarly situated, other employees must have . . . engaged in conduct similar to the plaintiff's, without such differentiating or mitigating circumstances that would distinguish their conduct or the appropriate discipline for it.").

"Whether two employees are similarly situated ordinally presents a question of fact for the jury." Graham, 230 F.3d at 39. "But this rule is not absolute and 'a court can properly grant summary judgment where it is clear that no reasonable jury could find the

similarly situated prong met.'" Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 790–91 (2d Cir. 2007) (quoting Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 499 n.2 (2d Cir. 2001)). Stated differently, "[w]hen a plaintiff's misconduct is objectively more serious than that of a proposed comparator, differential treatment by the employer does not create an issue of fact that will defeat a motion for summary judgment." Conway v. Microsoft Corp., 414 F. Supp. 2d 450, 464 (S.D.N.Y. 2006); see also Tomasino v. Mount Sinai Med. Ctr. & Hosp., 2003 WL 1193726, at *14 (S.D.N.Y. Mar. 13, 2003) (granting summary judgment where alleged comparators did not commit "the most serious of the infractions for which [plaintiff] was discharged").

Here, Harrison claims Sewell—a male FS-3—is a comparator. Sewell, like Harrison, experienced a lapse in situational awareness and committed a runway incursion. Unlike Harrison, however, Sewell was not terminated. To justify the different employment outcomes, the Port Authority highlights distinctions in the circumstances surrounding Sewell and Harrison's incursions. These purported distinctions include that: (1) Sewell's incursion occurred during a snow emergency, whereas Harrison's incursion allegedly occurred on a clear day; (2) Sewell admitted that he lost his situational awareness during the incident, whereas Harrison continues to deny—or is still unsure—that she committed the incursion; and (3) Sewell, unlike Harrison, had no prior documented training deficiencies. (Def.'s 56.1 ¶¶ 134–35.) Harrison counters that: (1) Sewell incurred because he made a wrong turn, and the snow would not make someone turn in the wrong direction; (2) Harrison wrote a letter apologizing if she, in fact, committed the incursion; and (3) Sewell barely passed his written DR2 examination, while Harrison obtained a perfect score. (Pl.'s 56.1 ¶¶ 134–35.)

12

Having waded through the parties' disagreements, this Court concludes that Sewell's status as a comparator is an issue best left for a jury. Notably, the Port Authority acknowledges that runway incursions are some "of the most critical safety issues at any airport because of the potential for a collision . . . [and] a catastrophic loss of life." (Def.'s 56.1 ¶ 46.) And Sewell's incursion caused one plane to abort its landing and another to abort its takeoff. (Jones Decl., Exs. 29, 30.) To be sure, this Court is mindful of the purported mitigating factors surrounding Sewell's incursion, especially the Port Authority's contention that Sewell incurred during a snowstorm. However, drawing all reasonable inferences in Harrison's favor, this Court is unable to determine that Harrison's incursion was "objectively more serious" than Sewell's.[2] Conway, 414 F. Supp. 2d at 464; see also Vaughn v. Empire City Casino at Yonkers Raceway, 2017 WL 3017503, at *18 (S.D.N.Y. July 14, 2017) (concluding that the "mitigating circumstances" offered by defendants did "not establish, as a matter of law, that [the comparator] and [p]laintiff [were] not similarly situated"). Accordingly, Harrison has established a prima facie case for wrongful termination.

B. Non-Discriminatory Reasons and Pretext

Since Harrison has met her initial burden, the Port Authority must "articulat[e] a legitimate, [non-discriminatory] reason for the conduct." Morris v. Temco Serv. Indus., Inc., 2011 WL 6761075, at *3 (S.D.N.Y. Dec. 13, 2011) (quotation marks omitted). This "burden . . . is light," as "[t]he employer need not persuade the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful

---

[2] The Port Authority also contends that Harrison overlooks a similarly-situated male FS-3, Ankit Ramchandani, who was fired following a runway incursion. This argument is meritless. Indeed, the Port Authority glosses over a critical distinction between Ramchandani's incursion and those committed by Harrison and Sewell: Ramchandani's incursion occurred after he "consciously turned off his vehicle's radio communication . . . and drove around the airfield while listening to music on his iPod." (Def.'s 56.1 ¶ 136 (emphasis added).)

13

behavior." Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 52 (2d Cir. 1998). Indeed, "[i]t is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory." Hyek v. Field Support Servs., 702 F. Supp. 2d 84, 93 (E.D.N.Y. 2010). If the defendant meets this burden, "the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." McBride v. BIC Consumer Prods. Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009) (quotation marks omitted). Poor performance is an adequate reason for termination. See, e.g., Wright v. N.Y.C. Off-Track Betting Corp., 2008 WL 762196, at *4 (S.D.N.Y. Mar. 24, 2008). Here, the Port Authority contends that Harrison exhibited training deficiencies and committed a runway incursion. The burden thus shifts back to Harrison to show that the Port Authority's reason is mere pretext and discrimination was the underlying motivator for her termination.

As part of her evidence of pretext, Harrison again points to the Port Authority's refusal to terminate Sewell following his incursion. "A showing that [a] similarly situated employee[] belonging to a different [protected] group received more favorable treatment can also serve as evidence that the employer's proffered legitimate, non-discriminatory reason for the adverse job action was a pretext for . . . discrimination." Graham, 230 F.3d at 43; Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 108 (2d Cir. 2010) ("[T]he fact that other younger employees were not disciplined for violating numerous policies is both prima facie evidence of discrimination (i.e., it suggests that [plaintiff] may have been treated differently from similarly situated co-workers), and evidence that the reasons given by [defendant] for firing [plaintiff] were pretextual."). This Court has already found a material dispute of fact as to whether Sewell is Harrison's comparator. Thus, Harrison has carried her burden in defeating the Port Authority's motion for summary judgment as to her wrongful termination claim.

14

III.   Hostile Work Environment

Finally, the Port Authority moves for summary judgment on Harrison's hostile work environment claim. "[T]he standard for establishing a hostile work environment is high." Terry, 336 F.3d at 148. "In order to establish a hostile work environment claim under Title VII, a plaintiff must produce enough evidence to show that the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Gorzynski, 596 F.3d at 102 (quotation marks omitted). The conduct must be both "objectively severe and pervasive . . . [to] a reasonable person" and "subjectively . . . hostile or abusive [to the plaintiff]." Patane v. Clark, 508 F.3d 106, 113 (2d Cir. 2007) (per curiam) (quotation marks omitted). "Generally, unless an incident of harassment is sufficiently severe, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Gorzynski, 596 F.3d at 102 (quotation marks omitted); see also Aulicino v. N.Y.C Dep't of Homeless Servs., 580 F.3d 73, 83 (2d Cir. 2009) ("For racist comments, slurs, and jokes to constitute a hostile work environment . . . there must be more than a few isolated incidents of racial enmity." (quotation marks omitted)).

Harrison fails to support her hostile work environment claim. Harrison alleges three instances of workplace harassment predicated on her sex and race: (1) Boyer and Martinez's alleged expectation that a man was chosen to fill the vacant FS-3 position at EWR; (2) Boyer's use of the hangman game to grade Harrison's practice map test and his alleged habit of referencing Harrison with whistles, head nods, and the word "you"; and (3) Stanford's reprimand of Harrison for bringing her personal camera to work. Even assuming that Boyer and Martinez were, in fact, expecting a male candidate to fill the FS-3 vacancy, there is no evidence

indicating that their expectation constitutes "objectively pervasive" harassment. The same is true of Stanford's alleged comments when questioning Harrison about her camera. And while Boyer's use of the hangman game to grade Harrison's map test was arguably in poor taste, "courts in the Second Circuit require a more pervasive and relentless pattern of behavior" than one or two isolated instances of insensitive conduct. Morrison v. United Parcel Serv., Inc., 2019 WL 109401, at *3 (S.D.N.Y. Jan. 4, 2019). Moreover, Harrison fails to explain why the game is objectively discriminatory. Accordingly, her hostile work environment claim under Title VII is dismissed.

## CONCLUSION

For the foregoing reasons, the Port Authority's motion for summary judgment is granted in part and denied in part. Harrison's claim for discrimination based on the Port Authority's alleged failure to train her is dismissed, as is her hostile work environment claim. However, Harrison's claim for wrongful termination may proceed. The parties shall submit a joint pre-trial order by May 8, 2020 and appear for a final pre-trial conference on May 14, 2020 at 11:30 a.m. The Clerk of Court is directed to terminate the motion pending at ECF No. 47.

Dated: March 13, 2020
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.